IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CRYSTAL L. WHITE,                  )
                    Plaintiff,     )
                                   )
     vs.                           )     Civil Action No. 06-246
                                   )     Judge Joy Flowers Conti/
JOANNE B. BARNHART, Commissioner   )     Magistrate Judge Amy Reynolds Hay
of Social Security Administration, )
                    Defendant.      )

REPORT AND RECOMMENDATION

I.     RECOMMENDATION

        It is respectfully recommended that the motion for summary judgment filed by

Plaintiff [Dkt. No. 9] be denied.  It is further recommended that the Motion for Summary

Judgment filed by Defendant [Dkt. No. 11] be granted and that the decision of the Commissioner

be affirmed.

II.    REPORT

        Plaintiff, Crystal White, submitted the instant complaint on February 22, 2006,

under 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of

Social Security ("Commissioner"), denying Plaintiff's claim for Supplemental Security Income

benefits ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-

1383f.

        A.     **Procedural History**

        Plaintiff filed an application for SSI on June 24, 2003, alleging disability as of

October 14, 2002, due to her having failed the written part of the certification required to

continue working at the nursing homes where she had been employed (Tr. 54-57, 65).   Benefits

were denied on December 4, 2003, and on February 2, 2004, plaintiff requested a hearing (Tr. 36-

39, 40).  A hearing was held before an Administrative Law Judge ("ALJ") on May 10, 2005, and

in a decision dated September 20, 2005, the ALJ found that, although plaintiff was unable to perform the full range of medium work, there were nevertheless a significant number of jobs existing in the national economy that she was able to perform and, thus, she was not disabled (Tr. 13-22). The Appeals Council denied plaintiff's request for review on January 11, 2006, rendering the ALJ's decision the final decision of the Commissioner (Tr. 5-7). This appeal followed and the parties' cross motions for summary judgment are presently before the Court.

**B.     Medical History**

Plaintiff began seeing primary care physician Betty-Jean Bardella, M.D., on June 9, 2003, complaining of depression after the birth of her third child fifteen months earlier (Tr. 102). Plaintiff reported having been prescribed Zoloft at her postpartum visit which she felt helped her take the edge off things emotionally but discontinued taking it because she had no prescription drug coverage (Tr. 102). She also reported that she no longer enjoyed the recreational activities that she used to, was frequently tearful and irritable, had a loss of appetite and sexual desire, suffered from headaches, had disturbed sleep and complained of fatigue (Tr. 102). Although Plaintiff stated that she was struggling with her son -- her second child -- who had behavioral outbursts, she denied having difficulty caring for her toddler, having feelings of hopelessness or despair or any domestic problems (Tr. 102). Dr. Bardella prescribed Prozac and recommended a follow up visit in one month (Tr. 102).

Martin Meyer, Ph.D., a clinical psychologist, performed a consultive evaluation on October 22, 2003 (Tr. 104-07). Plaintiff reported daily and severe symptoms of depression and anxiety following the birth of her son in 1994 (Tr. 105). Plaintiff complained of mood swings, crying spells, nervousness, depressed appetite and poor sleep patterns (Tr. 105). Plaintiff also admitted suicidal ideation and indicated that the Prozac was ineffective (Tr. 105). On mental status evaluation, Dr. Meyer reported good eye contact, coherent and spontaneous speech

2

and no evidence of disturbances in thought process (Tr. 105-06).  He also indicated that

Plaintiff's mood was depressed and that her affect was congruent with her mood.  She denied any

hallucinations (Tr. 105-06).  Plaintiff displayed poor ability for critical thinking and limited

cognitive abilities with suspected developmental delay (Tr. 106).  Plaintiff was unable to explain

a proverb, perform serial subtraction from one hundred or perform the mental computation 4x9

but was otherwise fully alert and oriented as to time, place, person and date (Tr. 106).  Dr. Meyer

found that Plaintiff could recall childhood experiences adequately but her immediate memory

and ability for sustained concentration was poor and he reported difficulties with impulse control

(Tr. 106).  Dr. Meyer noted that IQ testing in 1984, employing the Wechsler Intelligence Scale

for Children-Revised ("WISC-R") showed a verbal IQ of 74, a performance IQ of 67 and a full

scale IQ of 69 (Tr. 106).  He diagnosed Plaintiff with dysthymic disorder, generalized anxiety

disorder, and mild mental retardation and assessed a Global Assessment of Functioning ("GAF")

score of 50-55 (Tr. 107).[1]  Dr. Meyer also found that although Plaintiff would have marked

difficulty understanding, remembering and carrying out detailed instructions, she would have

only a slight limitation in her ability to understand, remember and carry out simple instructions

(Tr. 110).  As well, Dr. Meyer concluded that while Plaintiff would have marked limitations in

responding appropriately to supervision, co-workers and work pressures, her limitation on

making judgments on simple work related decisions was only moderate (Tr. 110).

Clinical Psychologist Edward Zuckerman, Ph.D., reviewed the documentary

evidence on November 21, 2003, and determined that although plaintiff had severe mental

---

[1]    The GAF is a single value that reflects the individual's overall level of functioning at the time of the evaluation.  A GAF in the 51 to 60 range indicates some moderate symptoms (e.g., flat affect and circumstantial speech and occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers and co-workers), whereas a score between 41 and 50 indicates "serious symptoms."  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994).

impairments they did not meet or equal any listings (Tr. 112, 122).  Rather, Dr. Zuckerman found that Plaintiff's mental impairments imposed only mild restrictions on activities of daily living and difficulties in maintaining social functioning and that she had moderate difficulties in maintaining concentration, persistence or pace (Tr. 122).  As well, Dr. Zuckerman indicated that Plaintiff's mental residual functional capacity was not markedly limited in any respect and found that her basic memory processes were intact, that she could make simple decisions, carry out short and simple instructions, maintain concentration and attention for normal periods of time, would be able to maintain regular attendance and be punctual, would not require special supervision in order to sustain a work routine, was able to maintain socially appropriate behavior, and that her ADL's and social skills are functional. (Tr. 126-28).  Dr. Zuckerman concluded that Plaintiff could function in production oriented jobs requiring little independent decision making and that Plaintiff retained the ability to perform repetitive work activities without constant supervision (Tr. 128).

Plaintiff was seen by a general practitioner, Todd Jones, M.D., in February of 2004, and reported symptoms of depression (Tr. 146).  Dr. Jones started Plaintiff on some samples of Lexapro, an antidepressant, and recommended a follow up visit in two weeks (Tr. 146).  At that time, Plaintiff reported that she had some improvement with the medication (Tr. 148).   Dr. Jones increased her dosage of Lexapro to 20 mg. and asked her to return in four weeks (Tr. 148).

Plaintiff subsequently sought mental health treatment at Family Counseling and Child Services in April of 2004 indicating a depressed mood, sleep disturbances and bouts of crying and was given an initial diagnosis of major depressive disorder, post-traumatic stress disorder and learning disorders (Tr. 137).  Plaintiff was assessed with a current GAF of 48, although a prior year GAF of 55 was noted (Tr. 137).  A psychiatrist from Family Counseling

and Child Services, Martin Buda, M.D., subsequently evaluated Plaintiff on May 13, 2004, and reported that plaintiff was alert and had normal speech, that her affect was responsive but her mood was depressed (Tr. 132).  Dr. Buda also reported that although Plaintiff frequently became tearful during the examination there was no evidence of mood instability and she denied any hallucinations or delusions (Tr. 132).  Noting that Plaintiff had some degree of psychomotor retardation perhaps due to her depressive state, Dr. Buda diagnosed Plaintiff with major depressive disorder and recommended that she continue with medication and therapy (Tr. 133-34).  He also assessed a GAF score of 50 (Tr. 133).

Plaintiff was examined by Psychiatrist Maximo Lockward, M.D., on May 25, 2004 (Tr. 203).  His notes reflect that Plaintiff was taking Wellbutrin, as apparently had been prescribed by Dr. Buda, and that Plaintiff reported feeling irritable and "down," that she slept poorly, had a poor appetite and low energy levels (Tr. 203).   Dr. Lockward, noting that Plaintiff was well groomed, pleasant, had no suicidal ideation, and had a normal affect, speech and thought process, diagnosed major depressive disorder and, in addition to the Wellbutrin, prescribed Trazodone to help her sleep. (Tr. 203).

Plaintiff continued to see Dr. Lockward once or twice a month until January of 2005 (Tr. 192-202), with little change in her reported symptoms other than to occasionally describe herself as doing "alright," and her mood as "even" (Tr. 195, 196, 197, 199, 200).  Dr. Lockward, consistently indicated that Plaintiff was well groomed, pleasant, had no suicidal ideation, had a normal affect, speech and psychomotor activity and continued to treat Plaintiff with antidepressants and Trazodone (Tr. 192-202).

Plaintiff was examined by Allan Clark, M.D., a psychiatrist, in February of 2005 (Tr. 150, 191).  Plaintiff again reported being depressed, irritable, tearful, and having decreased energy, and early morning awakenings (Tr. 150, 191).  Dr. Clark diagnosed chronic major

5

depression noting that Plaintiff appeared disheveled and had a stain on her jacket but that her thoughts were organized, coherent and goal directed (Tr. 150, 191). He also indicated that Plaintiff had no homicidal or suicidal thoughts and continued Plaintiff on the medications she had been taking with the addition of Klonopin for anxiety (Tr. 150, 191).

Plaintiff saw Dr. Clark again on April 13, 2005, at which time he reported that Plaintiff's mood was reasonably stable, that she was sleeping well, and that she was tolerating her medications well although the Klonopin had not improved her mood or anxiety, which he described as being on the lower side (Tr. 149, 190). Dr. Clark further indicated that although Plaintiff was still quite tearful at times and had some depressive days she was alert, oriented, calm and cooperative and had some good days (Tr. 149, 190). Plaintiff again denied any hallucinations, delusions or suicidal ideations (Tr. 149, 190). Dr. Clark diagnosed major depressive disorder and borderline personality disorder and continued her medications as previously prescribed (Tr. 149, 190).

On May 11, 2005, Dr. Clark reported that Plaintiff continued to feel depressed related to her son's difficulties, had low energy, was tearful and had lost interest in usual activities (Tr. 189). He again indicated that Plaintiff had no suicidal thoughts, hallucinations, or delusions and, although her affect was restricted, she was alert, oriented, calm, cooperative, and that her insight and judgment were good (Tr. 189).

Plaintiff also attended weekly therapy sessions with a therapist, Marcia Snyder, for approximately a year between April of 2004 and May of 2005 (Tr. 156-87). Ms. Snyder invariably reported that Plaintiff was clean, neat and appropriately dressed, although she occasionally presented with body odor, and that she was oriented as to time, place and person and her thought patterns were within normal limits (Tr. 156-87). She also indicated initially and at varying times thereafter that Plaintiff was tearful, had slightly slurred speech due to a speech

6

impediment and that she was overwhelmed with sadness and guilt.  Ms. Snyder's notes mostly consist of Plaintiff's reported difficulties dealing with her two oldest children, who appear to have a number of problems, her concern about their welfare and the resulting stress on her relationship with her boyfriend (Tr. 156-87).  Ms. Snyder indicated in a letter dated May, 6, 2005, that she believed Plaintiff was unable to work "based on her emotional status, limitations educationally, as well as the multiple difficulties + challenges with her children," who Snyder believed should not be left unattended for safety reasons (Tr. 154-55).

The record also contains the results of IQ testing performed in 1989, while Plaintiff was in the tenth grade to reevaluate her placement in EMR classes or those for the educable mentally retarded  (Tr. 75-6).  Using the WISC-R, testing showed that Plaintiff obtained a verbal IQ of 72, a performance IQ of 74 and a full scale IQ of 71 (Tr. 76).  Although it was stated that Plaintiff was one of the more capable EMR students it was recommended that she remain in EMR classes (Tr. 77, 79).

### C.    Hearing Testimony and ALJ Decision

At the administrative hearing, Plaintiff, who was represented by counsel, testified that she was born on June 2, 1972, and lived with her boyfriend and three children who, at the time, were 14, 10 and 3 years old (Tr. 215).  Plaintiff testified that although she was in special education throughout school she graduated from high school and subsequently took nurses aid classes at Whitecliff Nursing Home and St. Paul's Nursing Home (Tr. 215-16).  Plaintiff worked at these homes for a total of four to six months in 2001 and 2002 while taking the classes but had to leave when she was unable to pass the certification tests (Tr. 216-218).  Before that, plaintiff testified that she babysat in her home for a couple of months, worked for a cleaning service for six or seven months, and did janitorial work at Thiel College (Tr. 218, 230).

Plaintiff also testified that she had a miscarriage in 2003 to which she attributes her depression along with the fact that the father of her ten year old, who has been diagnosed with ADHA and as being bipolar, used to beat her (Tr. 215-16, 219-20).  It was also Plaintiff's testimony that she believes her son, who appears to have some behavioral problems, is disabled and that her boyfriend is presently on disability following back surgery (Tr. 220, 228, 238-39). Plaintiff testified that her mother died when she was fourteen and that her father was on disability for as long as she can remember (Tr. 220-21).  Plaintiff allowed that she doesn't drive because she failed the driver's test and that she is 5'3" and weighs 220 pounds (Tr. 220).  Plaintiff stated that she tries to do the laundry, cooking and cleaning but that she sometimes gets too depressed allowing that she has been treated for depression for about two years (Tr. 221-22).  Plaintiff indicated that prior to treatment she was not on any medication but has since been prescribed Prozac and now Effexor which appears to help although she still cries about a lot of things (Tr. 222).  Plaintiff also indicated that she was taking Trazodone and Wellbutrin and has been seen by various psychiatrists during the previous year or since June of 2004 (Tr. 222-27).  She also sees a counselor once a week (Tr. 235-36).

Plaintiff testified that she stays at home during the day and tries to spend time with her three year old while her other children are in school and that she takes naps (Tr. 228). She also allowed that she does the cooking, cleaning and laundry although sometimes her boyfriend will cook because she is sleeping or is in one of her moods (Tr. 228).

Plaintiff stated that prior to 1999 she was not employed but was on welfare and living with her son's father who was employed and that her daughter was receiving child support from her father.  Plaintiff testified that at the time of the hearing her only sources of income were her son's SSI and her daughter's child support (Tr. 229-30).

Plaintiff also testified that she routinely goes to bed at 2:00 a.m., wakes up at 5:00 a.m., takes a nap for about two hours when she puts her three year old down for a nap around 11:00 a.m., and takes another nap between 4:00 and 5:30 p.m. (Tr. 230, 234-35). In the evening, Plaintiff testified that she tried to go to her oldest daughter's midget football games the year before but didn't make all of them and that she doesn't go to her band concerts because they occur when she's usually laying down or trying to do housework (Tr. 230-31, 232). Plaintiff allowed that her father died in 1991 and that she doesn't see her brothers, who don't live in the area, or her half sister because she works so many hours (Tr. 231-32). She also testified that she hasn't seen her friends for awhile because they are working or she just doesn't want to see anyone and, although her boyfriend likes to fish, she doesn't go with him (Tr. 232, 234).

Plaintiff testified that she has no difficulty caring for her three year old but she has crying spells three or four times a day at which time she hibernates in her bedroom and has days when she doesn't want to go out of the house at all (Tr. 233). When she does go out, which is about once a week, Plaintiff stated that she walks downtown and goes to the Goods Shop or Goodwill and looks around (Tr. 234). Plaintiff also testified that she used to play on the trampoline with her children but has gained a lot of weight since she had her last child and has no desire to get on the trampoline, go anywhere or be bothered with anyone (Tr. 236-37). She stated that two or three times a month she goes into her bedroom and shuts the door for several hours and has a period of about an hour everyday that she's depressed or anxious enough that she doesn't do anything (Tr. 237-38).

A vocational expert ("VE") was also called to testify at the hearing and allowed that Plaintiff's past work in cleaning positions are classified as unskilled and medium and that her work as a nurse's aide, even though she did not pass the certification tests, was semiskilled at the heavy exertional level (Tr. 240). The ALJ then asked the VE to consider an individual of

9

Plaintiff's age, education and work experience who was limited to simple instructions, and who should avoid intensive supervision, changes in the work setting, hazards, such as moving machinery and heights, and travel to unfamiliar places (Tr. 240). Based upon this hypothetical question, the VE testified that such an individual could not necessarily perform Plaintiff's past work but could perform jobs such as a surveillance system monitor in the sedentary category, bench assembler in the light category and janitorial positions in the medium category, all of which exists in significant numbers in the national economy (Tr. 241). The VE further testified that if the individual's reading, spelling and math levels were at a fourth grade level and the individual should avoid decision making on the job and should avoid stress associated with assembly line pace, it would not alter his testimony (Tr. 241-42). If, however, the individual had to lay down for 45 minutes three times a day then she would not be employable full time (Tr. 242). The VE also testified in response to questions by Plaintiff's counsel that if the individual had crying spells for fifteen to thirty minutes three or four times a day or a one hour period of depression during which she would be unable to perform any work activity, she would not be capable of sustaining substantial gainful work activity (Tr. 242-44).

Based on this evidence the ALJ found that Plaintiff's major depression, borderline personality disorder and mild retardation were severe but that they did not meet or equal the impairment listings in Appendix 1, Subpart P, Regulation No. 4 (Tr. 21, Findings 2, 3). The ALJ also found that although plaintiff was unable to perform a full range of medium work she nevertheless retained the residual functional capacity to perform a significant number of jobs in the medium category that existed in the national economy and, thus, was not disabled (Tr. 21, Findings 10, 11, 12).

D.     **Standard of Review**

In reviewing the final decision of the Commissioner denying a claim for SSI the question before the Court is whether there is substantial evidence to support the findings of the Commissioner.  42 U.S.C. § 405(g).  See Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999); Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986), cert. denied, 482 U.S. 905 (1987).  Substantial evidence is defined as less than a preponderance of the evidence and more than a mere scintilla; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552, 565 (1988); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).

The Act defines disability in terms of the effect an impairment has on a person's ability to function in the work place.  42 U.S.C. § 423(d)(1)(A).  See Heckler v. Campbell, 461 U.S. 458, 460 (1983).  A claimant bears the burden of showing not only that she has a medically determinable impairment, but that it is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 1382c(a)(3)(A) & 3(B).  See Heckler v. Campbell, 461 U.S. at 460; Petition of Sullivan, 904 F.2d 826, 845 (3d Cir. 1990).  The responsibility of determining whether or not a claimant's residual functional capacity, or her capabilities despite her limitations, allows her to engage in any substantial activity is reserved to the ALJ after reviewing all of the evidence.  20 C.F.R. §§ 416.946.  See 20 C.F.R. § 416.946.

A five-step process is used to determine disability eligibility.  See 20 C.F.R. § 404.1520.[2]  Here, the ALJ determined that Plaintiff was not disabled at the fifth step which

---

[2]     The five-step sequential evaluation process for disability claims requires the Commissioner to consider whether a claimant: (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past relevant work, and (5) if not, whether she can perform any other work in the national economy.  20 C.F.R. §§ 404.1520, 416.920.

requires the Commissioner to prove that, considering the claimant's residual functional capacity,[3] age, education, and past work experience, she can perform work that exists in significant numbers in the regional or national economy.  42 U.S.C. § 423(d)(2)(A).  See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).  In this case, the ALJ found that Plaintiff retained the residual functional capacity to perform a range of medium work and, thus, was not disabled.

  **E.** **Discussion**

    Plaintiff essentially raises three arguments: 1) the ALJ erred by not assessing Plaintiff's work-related limitations as being greater than he did; 2) that the ALJ erred by finding that Plaintiff's mental impairments did not meet listing 12.05(C); and 3) that the ALJ's findings with respect to Plaintiff's credibility are not supported by the evidence.

    With respect to the first argument, Plaintiff specifically asserts that the ALJ erred by not assessing Plaintiff's work-related limitations to be greater than he did as his findings in this regard are inconsistent with the medical evidence submitted by Drs. Meyer and Buda.[4]  In particular, Plaintiff cites to the therapist's notes from Family Counseling and Child Services in April of 2004 and Dr. Buda's subsequent findings in May of 2004, that plaintiff has symptoms of depression, cries frequently, has difficulty maintaining sleep, feels sad, and is without energy and motivation.  Plaintiff also points to the fact that the therapist and Dr. Buda assessed her GAF at 48 and 50, respectively (Tr. 132-37).  Plaintiff also cites to Dr. Meyer's report of October 22, 2003, in which he indicates that Plaintiff complained of daily mood swings, crying spells,

---

[3] A claimant's "residual functional capacity" is what she can do despite the limitations caused by her impairments. Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001).

[4] To the extent that Plaintiff has also argued that the ALJ's assessment of her limitations is inconsistent with her hearing testimony, she appears to be challenging the ALJ's evaluation of her credibility which is discussed below.

nervousness, depressed appetite, poor sleep patterns, suicidal ideation, and that she had low self esteem, unresolved guilt, and poor memory. Dr. Meyer also cited to an IQ test performed in 1984, which showed that Plaintiff had a verbal IQ of 74, a performance IQ of 67, a full scale IQ of 69 and a GAF assessment of 50-55. Plaintiff particularly relies on Dr. Meyer's conclusions that Plaintiff would have marked limitations on her ability to respond appropriately to supervision, co-workers and work pressures (Tr. 104-07).

Review of the ALJ's decision, however, shows that he not only expressly took these findings into consideration but found that Plaintiff was, in fact, limited in her work-related abilities. Specifically, the ALJ found that Plaintiff could follow only simple, routine instructions, and should avoid intensive supervision, changes in the work setting, hazardous materials, and moving machinery as well as decision-making, reading, spelling, performing math at more than a fourth grade level, and the stress associated with assembly line pace work (Tr. 21, Finding 5). Thus, it appears that the ALJ not only considered the limitations as assessed by Drs. Buda and Meyer but imposed even greater work-related restrictions than they had assessed. Indeed, other than Dr. Meyer's conclusions regarding Plaintiff's ability to respond to supervisors, co-workers and work pressures neither doctor specifically places any work-related limitations on Plaintiff. Moreover, Dr. Meyer also found that Plaintiff had good eye contact, coherent and spontaneous speech, no evidence of disturbances in thought process, that she was fully alert and oriented as to time, place, person and date, that she had only a slight limitation in her ability to understand, remember and carry out simple instructions, and that her limitation on making judgments on simple work related decisions was only moderate. As well, his GAF assessment of 50-55 is indicative of only moderate symptoms.

Moreover, Dr. Zuckerman's findings, upon which the ALJ particularly relied and which Plaintiff has not addressed at all, indicate that Plaintiff's mental impairments imposed only

mild restrictions on activities of daily living and difficulties in maintaining social functioning; that she had moderate difficulties in maintaining concentration, persistence or pace; that Plaintiff's mental residual functional capacity was not markedly limited in any respect; that her basic memory processes are intact; that she can make simple decisions, carry out short and simple instructions and maintain concentration and attention for normal periods of time; that she would be able to maintain regular attendance and be punctual; that she would not require special supervision in order to sustain a work routine and was able to maintain socially appropriate behavior; and that her ADL's and social skills are functional.  Dr. Zuckerman therefore concluded that Plaintiff can function in production oriented jobs requiring little independent decision making and that Plaintiff retained the ability to perform repetitive work activities without constant supervision (Tr. 112-128).  It therefore appears that the ALJ's findings regarding Plaintiff's mental work-related limitations are not only supported by substantial evidence but they are not, as Plaintiff has suggested, inconsistent with the medical evidence.  See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (An ALJ may rely on the opinions of non-examining physicians, even when those opinions contradict the opinion of a treating physician, if the opinions are consistent with the record).  See also 20 C.F.R. § 404.1527(f) (State agency physicians "are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.")

Plaintiff also argues that the ALJ erred in finding that Plaintiff's mental impairments did not meet listing 12.05(C) concerning mental retardation and, thus, that she was not disabled at step three of the sequential process.  See 20 C.F.R. §§ 416.920(a)(4)(iii), 416.925; 20 C.F.R. pt. 404, subpt. P, app. 1.

The listings are a regulatory device used to streamline the decision process by identifying those claimants whose medical impairments are so severe that they are presumed to

14

be disabled.  20 C.F.R. § 416.925(a); Sullivan v. Zebley, 493 U.S. 532 (1990).  In order to meet listing 12.05(C) a claimant must satisfy three requirements.  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C).  First, the claimant must meet the diagnostic description for mental retardation or that she has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period."  Id.  Second, the claimant must produce a valid IQ score within the range of 61 through 70.  Id.  And last, the claimant must have another severe physical or metal impairment.  Id.  It is the claimant's burden to demonstrate that all three of these requirements have been met.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Here, the Commissioner does not dispute that Plaintiff has satisfied the first and third requirements but argues that Plaintiff's mild metal retardation does not satisfy the second requirement as the IQ scores Plaintiff obtained in 1989, upon which the ALJ relied, were above 70.  Indeed, it appears that at that time Plaintiff obtained a verbal IQ score of 72, a performance IQ of 74 and a full scale IQ of 71 (Tr. 76).  It therefore appears that the ALJ's finding that Plaintiff did not meet the listing is supported by substantial evidence.

Plaintiff nevertheless argues that the ALJ should have accepted Plaintiff's 1984 scores which reflect a verbal IQ of 74, a performance IQ of 67, and a full scale IQ of 69 (Tr. 106), thereby satisfying the second requirement.  It is incumbent on the ALJ, however, to accept scores that are most consistent with the claimant's developmental history and degree of functional limitations.  See 20 C.F.R. pt. 404, subpart P. app. 1, § 12.00 (D)(6).  See also Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998) (IQ scores that are inconsistent with the entire record should be rejected.)  Here, the ALJ found that the 1989 scores were more reflective of Plaintiff's current intellectual abilities as evidenced by the fact that they were more recent and that she was able to respond appropriately to questioning at the administrative hearing (Tr. 19).  As well, the

15

record demonstrates that Plaintiff cleans, shops, does the laundry, cares for her children and was able to perform her responsibilities as a nurses aid which is a semi-skilled position (Tr. 240). It therefore appears that the ALJ decision to rely on Plaintiff's 1989 scores is consistent with her functional limitations.

Nor does Plaintiff's argument that the ALJ's finding of mild mental retardation presumes an IQ score below 70 compel a different conclusion. Indeed, as argued by the Commissioner, not only may individuals with IQ scores of up to 75 still be diagnosed with mental retardation, see DSM-IV, at 39-40, but the presumption advocated by Plaintiff would render the second requirement superfluous since every claimant that satisfied the first requirement -- i.e., that met the diagnostic description for mental retardation -- would necessarily satisfy the second. Thus, an IQ score of below 70 cannot be presumed from the mere diagnosis of mental retardation and Plaintiff's valid IQ scores of over 70 in 1989 provides substantial support for the ALJ's determination that she does not meet listing 12.05(C).

Finally, Plaintiff complains that the ALJ erred by not fully crediting her hearing testimony and takes issue with his other findings regarding Plaintiff's assertions of total disability. Specifically, Plaintiff faults the ALJ for miscategorizing her ability to perform activities of daily living, the extent of her depression, her motivation for filing for disability and her motivation to work.

Although an ALJ is obligated to consider a claimant's hearing testimony regarding his or her subjective complaints, he is not required to unquestioningly credit that testimony. Rather, he is to consider it in light of objective medical evidence and all other evidence of record. 20 C.F.R. § 416.929. See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). Moreover, an adverse credibility finding by the ALJ is entitled to substantial deference as it is solely the responsibility of the ALJ to determine whether a claimant's representations

16

concerning his or her symptoms is worthy of credence.  Id.; Kelley v. Sullivan, 890 F.2d 961, 964 (7th Cir. 1989).

It should be noted at the outset that while Plaintiff has challenged certain findings made by the ALJ she has not specifically challenged the ALJ's findings that her subjective complaints and assertions of total disability are inconsistent with the objective medical evidence (Tr. 16-18).  Such inconsistencies, however, alone are sufficient to warrant an adverse credibility determination.  See 20 C.F.R. § 416.929(c); Hartranft, 181 F.3d at 362 (The ALJ should give little weight to a claimant's subjective complaints when they are contradicted by the objective medical evidence.)  It nevertheless appears that Plaintiff's complaints are without merit.

Plaintiff first faults the ALJ for finding that she was able to care for her three children and, thus, was not markedly limited in her activities of daily living without any evidence regarding the extent of care provided and for finding that she has a robust social life simply because she has a boyfriend.  The ALJ, however, did not rely on these factors alone to arrive at his conclusion regarding Plaintiff activities of daily living but cited to Dr. Zuckerman's uncontroverted medical opinion that Plaintiff's daily and social activities were only mildly restricted which was consistent with Plaintiff's actual activities.  Indeed, Plaintiff's own testimony demonstrates that she was able to engage in daily activities such as cleaning, shopping and doing the laundry.  Moreover, Plaintiff specifically admitted having no trouble caring for her three year old and reported no difficulties with maintaining a relationship with her boyfriend other than to indicate in February of 2005 that her older childrens' behavioral problems created stress between them (Tr. 102, 158, 233).

Plaintiff also argues that there is no evidence of record to support the ALJ's findings that Plaintiff's depression is situational or the result of postpartum depression following the birth of her daughter in 2002 and the miscarriage she suffered in 2003.  To the contrary, the

17

record appears to amply support the ALJ's conclusion as Plaintiff herself reported to Dr. Bardella in June of 2003, that she began experiencing depression after the birth of her child fifteen months earlier and indicated to Dr. Buda in May of 2004 that her miscarriage precipitated an increase in her depression and her need to seek treatment (Tr. 102, 204).  Under these circumstances, it appears that the ALJ's observation is amply supported by the record.

Plaintiff also takes issue with the ALJ's findings that she had a secondary motive for filing for disability benefits and was poorly motivated to work.  As already discussed, however, the record shows that Plaintiff did not seek treatment for her mental impairments until two weeks after she filed a disability application and eight months after her alleged onset date. Further, Plaintiff's earnings record shows that she did not work at all in 1997 and 1998 and did minimal work between 1999 and 2002 (Tr. 63).  The absence of any meaningful employment even before the alleged onset of her disability appears to provide the ALJ with substantial support for his conclusions.  See Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998) (Finding that a poor work history and secondary motive may be used to support an ALJ's findings that the claimant is not credible.); Gaddis v. Chater, 76 F.3d 893, 896 (8th Cir. 1996).  Indeed, as argued by the Commissioner, if Plaintiff only became unable to work when her condition became severe, as she has suggested, her earnings record would show an appreciable work experience prior to her onset date of October 2002.  Plaintiff's earnings record, however, shows little to no work since 1997 (Tr. 63).

Summary judgment is appropriate where there are no disputed material issues of fact and the movant is entitled to judgment as a matter of law.  Fed. R.Civ. P. 56(c).  In the instant case, there are no material issues of fact in dispute and it appears that the Commissioner's determination is supported by substantial evidence.  For this reason, it is recommended that plaintiff's motion for summary judgment (Docket No. 15) be denied, that defendant's motion for

summary judgment (Docket No. 17) be granted, and that the decision of the Commissioner be affirmed.

      In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the date of service of the objections to respond thereto.  Failure to timely file objections may constitute a waiver of any appellate rights.

      Respectfully submitted,


      /s/ Amy Reynolds Hay
      AMY REYNOLDS HAY
      United States Magistrate Judge


Dated: 16 October, 2006.

cc:    Terry K. Wheeler, Esq.
      56 Clinton Street
      Greenville, PA 16125

      Paul Kovac
      Assistant United States Attorney
      United States Attorney's Office
      700 Grant Street
      Suite 400
      Pittsburgh, PA 15219